UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARTIN MARIETTA MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES BRAINARD, individually and as | ) | |
| Mayor of the City of Carmel, CITY OF | ) | |
| CARMEL, CITY OF CARMEL AND CLAY | ) | |
| TOWNSHIP BOARD OF ZONING | ) | |
| APPEALS, JAMES HAWKINS, as a | ) | CASE NO. 1:06-cv-0825-DFH-TAB |
| member of the Board of Zoning Appeals, | ) | |
| EARLENE PLAVCHAK, as a member of | ) | |
| the Board of Zoning Appeals, MADELEINE | ) | |
| TORRES, as a member of the Board of | ) | |
| Zoning Appeals, ALAN POTASNIK, as a | ) | |
| member of the Board of Zoning Appeals, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Martin Marietta Materials, Inc. has sued the City of Carmel, the City of

Carmel and Clay Township Board of Zoning Appeals ("BZA"), Carmel Mayor James

Brainard, and four members of the BZA on claims relating to Martin Marietta's

current and proposed stone, sand, and gravel mining operations within Carmel

city limits.   Martin Marietta has asserted claims for:   (1) deprivations of

constitutional rights actionable under 42 U.S.C. § 1983; (2) common law breach

of contract; and (3) inverse condemnation under Indiana Code § 32-24-1-16.

Martin Marietta has also (4) appealed the BZA's denial of its special use

application for limestone mining.  Defendants have moved for summary judgment on the breach of contract and inverse condemnation claims.  As explained below, defendants' motion for summary judgment is denied on the breach of contract claim as it applies to land that Martin Marietta's predecessor owned when the contract was signed.  In exchange for valuable property and other consideration, Carmel extended a broad promise not to "take any action" to limit, prohibit, or restrict the predecessor's mining operations on its real estate.  Carmel has not offered any persuasive reason why it should not be held to that promise.  Carmel is entitled to summary judgment on the contract claim in part, however, to the extent that the claim applies to land that the predecessor did not own at the time the contract was signed.  Defendants' motion is also denied as to the inverse condemnation claim.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable trier of fact to find in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party, Martin Marietta. *Anderson*, 477 U.S. at 255. Martin Marietta and its predecessors have conducted mining operations and mineral processing undisturbed for nearly a half a century on land in Clay Township of Hamilton County. R. 2162. These operations have included quarries, underground mines, and sand and gravel pits that covered more than 1,000 acres west of the White River and between Interstate 465 on the south and 116th Street on the north.

Forests and farmland initially surrounded the mining operations. As the city of Carmel has grown, however, housing developments have crept closer and closer. By the mid to late 1990's, several housing additions bordered the north and west sides of what is now Martin Marietta property. Lakes left as a result of earlier mining and reclamation had become the center points of several of these neighborhoods. During this time, some nearby residents began complaining about noise, vibration, dust, and other disturbances caused by the mining.

The land involved in the present case lies north of 96th Street, east of Gray Road, south of 116th Street, and west of the White River. Pl. Ex. 17. Another parcel extends southwest from the intersection of 106th Street and Gray Road.

*Id.* Within this area, Martin Marietta owns some parcels of land and leases others. During the rapid expansion of neighboring residential developments, this land lay outside Carmel city limits.

Since at least 1980, two sections of Martin Marietta land – the parcel extending southwest from 106th Street and Gray Road and the parcel north of 106th Street and west of what later became the Hazel Dell Parkway – lay within districts Carmel had zoned as residential. R. 9249-51, 9255-56. Two areas – the parcel north of 106th Street and east of what later became the Hazel Dell Parkway and the parcel east of Gray Road, north of 96th Street, south of 106th Street, and west of the White River – were not zoned at all by Carmel until annexed in 2002. See *id.*[1]

In the late 1990's, Carmel decided to build the Hazel Dell Parkway. Carmel originally planned to have this parkway run south along the west side of the White River, then turn west on 106th Street to meet up with Gray Road, where drivers would turn south to reach 96th Street. Def. Ex. 1 at 1; Pl. Ex. 17. To simplify travel and reduce construction costs, Carmel contracted on November 5, 1997, with Martin Marietta's immediate predecessor American Aggregates Corporation

---

[1]The parties submitted only the ordinance annexing Martin Marietta's property north of 106th Street and east of the Hazel Dell Parkway. Pl. Ex. 19 (annexing parcel on October 23, 2002). Because the other annexation ordinances were not submitted, the court is unable to determine with any certainty when all of the pieces of Martin Marietta and Mueller property were annexed. The parties, however, do not dispute that Carmel annexed all the relevant land in 2002.

("American") to buy a strip of American's land over which the parkway could continue directly south to 96th Street and eliminate the detour to Gray Road.  Def. Ex. 1 (the "Parkway Contract") at 1.

In the Parkway Contract, Carmel and American exchanged a number of promises.  Carmel agreed to pay $2,400,000 for the easement to build and maintain the parkway.  *Id.* at 4.  American promised not to conduct surface mining within 100 feet of the parkway, other public easements, or property lines with other landowners.  *Id.* at 6.  American reserved the right to mine underneath the parkway – at a depth of at least fifty feet – for up to ninety years.  *Id.* at 9-11.  The parties agreed that Carmel might annex land American owned at the time of contracting, but that Carmel would not do so until at least January 1, 2000.  Carmel further agreed that upon annexation, it would not object to any proposal by American to re-zone the annexed land for mining operations as long as the proposal was consistent with Carmel's comprehensive plan.  American agreed to convey to Carmel real estate adjacent to Carmel's utility plant as well as to donate to Carmel two other thirty-seven acre tracts.  *Id.* at 11-12.

As a specific inducement for American to convey the parkway land and the three other parcels, the parties created a covenant restricting Carmel's ability to interfere with mining and mineral processing operations on American's land.  Carmel made the promise at the center of this case.  The city agreed that it would "not initiate any proceeding or take any action, or participate in any proceeding

-5-

or action, to limit, prohibit or restrict American's, and its successors'-in-interests, mining operations or the operations of the Related Industries located on American's real estate whatsoever, including, but not limited to, nuisance or trespass." *Id.* at 14.  Carmel also promised not to sue American for any past, present, or future damages arising out of American's non-negligent mining operations and related processing activities. *Id.*

Shortly after the Parkway Contract was signed, American sold its interests to Martin Marietta.  R. 2199.  On January 1, 2000, Martin Marietta entered into a mining lease for the "Mueller property," two parcels of land owned by the Helen M. Mueller Conservatorship.  R. 9742, 9758.  The two parcels involved in the Mueller lease were then adjacent to existing Martin Marietta mines.  The "Mueller North" parcel extended northwest from the intersection of 106th Street and Hazel Dell Parkway and was zoned as a residential district.  R. 9250-51, 9255-56, 9742, 9758; Pl.'s Ex. 17.  The "Mueller South" parcel extended southwest from the same intersection and was not zoned. *Id.*  Martin Marietta leased the Mueller parcels for twenty years at a rate of $250,000 per year – a total commitment of at least $5,000,000.  Def. Ex. 3 at 2-3.  The lease also gave Martin Marietta the option to extend the lease for up to four five-year extensions. *Id.* at 2.  Mueller retained the right to collect royalties on each ton of material removed from the Mueller property and sold.  Royalties would be credited against any rent owed.

On May 30, 2000, vexed by disturbances created by Martin Marietta's mines, residents from the adjacent Kingswood neighborhood sued Martin Marietta, Carmel, the BZA, and other defendants for not obtaining, or for not requiring Martin Marietta to obtain, special use permits that the residents believed were required.  R. 9830.  The Kingswood Homeowners Association ("Kingswood") argued that the Martin Marietta property lay within an urban area – specifically residential districts – and was subject to Carmel and Clay Township zoning ordinances and land use regulations.  Pl. Ex. 13 at 2-3; R. 2199-2200.  Kingswood believed that the regulations required Martin Marietta to apply for special use permits to continue operating its mines and mineral processing plants.  Martin Marietta and Carmel maintained that Martin Marietta's land – both owned and leased – was outside an urban area and operated as a legal non-conforming use. Def. Ex. 5 at 1, 3.

Indiana Code § 36-7-4-1103 defines an urban area as (1) within a municipality's corporate boundaries; (2) any land used for residential purposes where at least eight homes exist within any quarter-mile square area; or (3) any land contiguous to the municipality that has been or is planned for residential use.  There is some indication that a partial summary judgment decision by the state court found that the Martin Marietta and Mueller properties were in an urban area before December 2001, see R. 2162, 2199, but the parties have not submitted the decision to this court.  A March 2001 affidavit from Carmel's zoning

administrator indicated that both Mueller properties – north and south of 106th Street – lay outside urban areas.  R. 9893-95.

If the land was outside an urban area, Indiana Code § 36-7-4-1103(c) prohibited Carmel and its planning commission from enacting ordinances or taking action that completely restricted Martin Marietta's mining operations.  If the land was in an urban area and also zoned as a residential district, Martin Marietta was required to apply for a special use permit or to qualify either as an existing use or a legal non-conforming use under the Carmel zoning ordinance.  See Def. Ex. 4; R. 9169-70.[2]

In the fall of 2001, Carmel hired a private consulting company to develop a mining ordinance and land use policies that would address the city's interests in allowing Martin Marietta's mining operations to continue and in quelling discontent from nearby residents upset by mining-related disturbances. R. 2198. On May 17, 2002, Kingswood, Carmel, Martin Marietta, and the BZA settled Kingswood's May 30, 2000, lawsuit.  In that agreement, the parties conceded that operations on Martin Marietta's land north of 96th Street and south of 106th Street constituted legal non-conforming uses that could not be substantially

---

[2]The development of the zoning ordinance's section outlining special use permits within residential districts – 5.02 – is unclear.  The section does not appear in the 2001 version of the zoning ordinance, R. 8788, but does appear in an April 2002 version, R. 9244-45.  The April 2002 version notes that section 5.02 was amended in July 1997 and again in 1999, indicating that at least prior to July 1997, it is possible, although not certain, that the zoning ordinance required special use permits for mining activities in residential districts. R. 9244-45, 9247.

modified or expanded without obtaining a special use permit or a new zoning classification.  Def. Ex. 5 at 1, 3; R. 9843.

Martin Marietta agreed to stop asserting that the Mueller property was outside an urban area, *id.* at 3, but the parties recognized that nothing in the agreement affirmatively determined that the Mueller property was in an urban area, *id.* at 8.[3]

In 2002, Carmel annexed the Martin Marietta and Mueller land then outside Carmel city limits – making the land an urban area.  Martin Marietta then submitted five applications for special use permits relating to the Mueller property to the BZA on December 13, 2002.  The first two applications requested approval to mine sand and gravel on Mueller South and North respectively.  The third application requested approval to surface mine limestone on Mueller South.  The fourth and fifth applications requested approval to mine limestone underground on Mueller South and North respectively.

Just six days after Martin Marietta filed these applications, the BZA strategically amended its procedural rules to discourage further appeals.  Before the amendment, the BZA rules had required an applicant to wait six months after

---

[3]Martin Marietta also agreed to send a representative to Kingswood meetings to report on the development of the Mueller property, as well as to pay for the publication of the Kingswood neighborhood directory, maintenance of the neighborhood's common areas, and social events held for the entire neighborhood each year that Martin Marietta extracted sand and gravel from Mueller North.

the date of a BZA decision denying an application before reapplying.  R. 9266. After the amendment, the rule required an applicant to wait six months after the date of the adverse decision or until the BZA's decision became final (including judicial review), whichever was later.  Pl. Ex. 8 at 1.  The BZA then informed Martin Marietta that more information was needed to proceed with the special use applications.  R. 1250-51.

Martin Marietta sued the BZA on January 17, 2003, claiming that the procedural rule amendment exceeded the BZA's authority and violated Indiana's Open Door Law.  R. 9926, 9930-31.  On July 26, 2004, the Hamilton Superior Court granted summary judgment in Martin Marietta's favor and invalidated the rule amendment.  Pl. Ex. 8.

In July 2003, during the litigation over the BZA rule amendment, Carmel passed an ordinance regulating mining operations.  Docket No. 148 Attach. 1. Martin Marietta contended that even attempting to comply with the ordinance would cost hundreds of thousands of dollars and that after it spent that money, the BZA could still arbitrarily deny Martin Marietta a mining permit.  Compl. ¶ 34. Martin Marietta filed another suit challenging the mining ordinance.  The Hamilton Superior Court enjoined the 2003 mining ordinance because Carmel again had violated the Indiana Open Door Law.  *Id.*, ¶¶ 35-36.  In February 2004, Carmel repealed the 2003 mining ordinance.  After some redrafting, Carmel passed another mining ordinance on April 18, 2005.  Docket No. 148 Attach. 2.

Martin Marietta again sued, and on May 26, 2005, the Hamilton Superior Court enjoined the new ordinance because, among other reasons, its enactment also violated the Indiana Open Door Law. Compl. ¶ 41. The Indiana Court of Appeals affirmed this injunction on July 5, 2006. See *City of Carmel v. Martin Marietta Materials, Inc.*, 849 N.E.2d 1197 (Ind. App. 2006). The Indiana Supreme Court granted transfer, see 860 N.E.2d 597 (Ind. 2006), thus vacating the Court of Appeals' decision, and heard argument in January 2007. The case remains pending there.

While these lawsuits proceeded, Martin Marietta's applications for mining sand, gravel, and limestone on the Mueller properties filed in December 2002 simply sat on the BZA calendar. The Carmel zoning ordinance dictated that special use applications were not formally submitted until the BZA accepted the applications as compliant and complete. Def. Ex.4 at 1. Before Martin Marietta filed these applications, the BZA had requested certain information from Martin Marietta about its future mining plans in order to evaluate Martin Marietta's request to rezone the Mueller property to a planned unit development. R. 1233-35, 1237-38, 2175. After receiving the applications, the BZA sent the applications for review to the private consulting group that had advised Carmel in drafting the mining ordinances, Spectra Environmental Group, Inc. ("Spectra"). R. 1246, 1250-51.[4] The BZA and Spectra identified a number of areas and types of

---

[4]Carmel's Department of Community Services initially reviewed the Martin Marietta special use applications. Under BZA procedural rules, the BZA may
(continued...)

additional information the BZA claimed it still needed before deeming the applications complete, including some information the BZA had requested before Martin Marietta submitted the applications.  R. 1250-55.

Over the course of the next two years, the BZA continued to inform Martin Marietta that it needed supplemental information to evaluate the applications.  In the fall of 2004, Martin Marietta made numerous commitments to support its Mueller South sand and gravel mining application.  R. 8082-88.  On December 13, 2004, the BZA approved Martin Marietta's first application to mine sand and gravel on Mueller South subject to such commitments.  R. 8070.  The BZA then turned to Martin Marietta's second application to mine sand and gravel on Mueller North.  Again, Martin Marietta made numerous commitments to support this second application.  R. 6047-54.  The BZA approved Martin Marietta's second application to mine sand and gravel on Mueller North on May 23, 2005, subject to such commitments.  R. 8155.

The BZA scheduled a hearing for Martin Marietta's third application to surface mine Mueller South for limestone on December 12, 2005.  R. 2570-72. After Kingswood residents complained about the proposed mining and submitted a written remonstrance, Carmel Mayor Brainard persuaded Martin Marietta to agree to continue the December 12, 2005, hearing on the third application.

---

[4](...continued)
delegate its administrative duties to the Department of Community Services. Compl. ¶ 55.

Compl. ¶¶ 58-60; R. 1439, 2578; Pl. Exs. 9, 10.  At a February 27, 2006, hearing, Mayor Brainard spoke against the third application, and the BZA continued the hearing until March 27, 2006.  R. 2581, 2586-91.  The March hearing was continued until April 24, 2006.  R. 2600, 2609.  At the April 2006 hearing, the BZA unanimously denied Martin Marietta's third special use application to surface mine Mueller South.  R. 2615-27.  Additional facts are stated below as needed, keeping in mind the standard for summary judgment.

## Analysis

Martin Marietta sued the defendants in this court on May 23, 2006, asserting three claims:  (1) deprivation of constitutional rights actionable under 42 U.S.C. § 1983; (2) common law breach of contract; and (3) inverse condemnation under Indiana Code § 32-24-1-16.  Martin Marietta also appealed the BZA's denial of Martin Marietta's third special use application in Count 4.  The court has federal question jurisdiction over the constitutional claims and supplemental and diversity jurisdiction over the state law claims.  See 28 U.S.C. §§ 1331-32; *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 163-66 (1997).  Defendants have moved for summary judgment on the breach of contract and inverse condemnation claims.

I.      *Breach of Contract Claim*

    A.      *The Scope of the Contract*

-13-

Martin Marietta alleges in Count II that Carmel breached the Parkway Contract by enacting the 2003 and 2005 mining ordinances and by the mayor's successful efforts to influence the BZA to delay and then to deny the third special use application for the Mueller South limestone surface mining operation.  In that 1997 contract, Carmel agreed that it would "not initiate any proceeding or take any action, or participate in any proceeding or action, to limit, prohibit, or restrict" the mining operations of American or its successors on American's real estate.

Carmel has tried to limit the scope of this broad promise by focusing on the term "proceedings."   Carmel argues that "proceedings" should be limited to lawsuits or similar proceedings and should not apply to the enactment of legislation, such as the 2003 and 2005 mining ordinances or the BZA denial of the special use application.  The argument misses the point.  The key language is not the term "proceeding" but the phrase that Carmel "shall not *take any action* . . . to limit, prohibit, or restrict" mining operations.  The city's argument on this score is frankly an unbecoming attempt by the city to avoid honoring a broad promise that it made to convince American to provide important benefits for the city (which the city apparently intends to retain).

Indiana law requires courts to apply unambiguous contract language so as to avoid rendering words, phrases, or terms meaningless.  See *Norwood Promotional Products, Inc. v. Roller*, 867 N.E.2d 619, 625 (Ind. App. 2007)

(interpreting phrase "under this Agreement" in arbitration clause to apply only to terms of the same agreement); *First National Bank & Trust v. Indianapolis Public Housing Agency*, 864 N.E.2d 340, 350 (Ind. App. 2007) (affirming grant of motion to dismiss defendant's counterclaim to recover attorney fees based on indemnity clause between the parties where contract language showed that indemnity clause did not apply to the underlying lawsuit); *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind. App. 1992) (reiterating that unambiguous contract language clearly indicates the parties' intent and should not be construed otherwise).

Carmel's attempt to ignore the broad phrase "or take any action" is not at all persuasive.  Restricting the prohibition to "proceedings" would render the plain language barring Carmel from taking "any action" to limit, prohibit, or restrict the plaintiff's mining operations meaningless and ineffective.  Indiana courts will enforce such deliberately broad promises.  See, *e.g.*, *Steiner v. Bank One Indiana, N.A.*, 805 N.E.2d 421, 427-28 (Ind. App. 2004); *Centennial Mortgage, Inc. v. Blumenfeld*, 745 N.E.2d 268, 278-80 (Ind. App. 2001); *Lexington Ins. Co. v. American Healthcare Providers*, 621 N.E.2d 332, 336-38 (Ind. App. 1993). Accordingly, the Parkway Contract prohibits Carmel from taking any action, including enacting new legislation that limits American's – and therefore Martin Marietta's – mining operations.

That prohibition is subject to a geographic limit.  By its terms, the Parkway Contract provision limits Carmel only with respect to the mining operations on

"American's real estate." When the contract was signed in 1997, American owned or had a vested interest in several parcels of land west of the White River, east of Gray Road, south of 116th Street, and north of 96th Street – as well as land extending southwest from the intersection of Gray Road and 106th Street. The undisputed facts show that American did not have a vested interest in the Mueller South or North properties at the time the Parkway Contract was signed.

To support its argument that the Parkway Contract restricts Carmel's ability to regulate mining activity on the Mueller property, Martin Marietta offers evidence that American had discussed the possibility of leasing the Mueller property for mining purposes with the Mueller Conservatorship before signing the Parkway Contract. Martin Marietta also asserts that the "Mueller property has been the only logical area to expand the Carmel quarry and mine for at least the past fifteen years." Pl. Ex. 6 at 2. For purposes of summary judgment, the court accepts this evidence as true. These preliminary discussions and statements did not produce any legal rights that would have restrained the Mueller Conservatorship from managing, disposing of, or otherwise using its land in any way without American's consent. The court assumes that American was interested in mining the land, but on November 5, 1997, it was not entitled to mine the land and did not then have rights to do so in the future. American thus had no such rights it could have transferred to Martin Marietta.

The breach of contract claim therefore can reach "any action" Carmel has taken to limit Martin Marietta's mining operations on land that American owned or in which it had a vested interest by November 5, 1997.  Martin Marietta has submitted evidence that Carmel enacted mining ordinances that purported to limit and restrict Martin Marietta's mining operations on land American owned or had a vested interest in by November 5, 1997.[5]  Based on this evidence, a reasonable trier of fact could find that Carmel breached the Parkway Contract.

---

[5]The court grants Martin Marietta's August 14, 2007, motion to supplement the certified record with copies of the two ordinances.  The court could properly take judicial notice of such ordinances, and the supplement to the record is a convenience to the court.

B.    *Carmel's Public Policy Argument*

Carmel argues that if the court construes the Parkway Contract to apply to legislative actions – such as enacting the mining ordinances – and exercises of the police power to protect public health and safety, then the Parkway Contract should be deemed void as against public policy.  Carmel relies on *Northern Pacific Railway Co. v. Minnesota*, 208 U.S. 583 (1908), and *Trotter v. Nelson*, 684 N.E.2d 1150, 1155 (Ind. 1997).  In *Northern Pacific Railway*, the Supreme Court observed: "the exercise of the police power cannot be limited by contract for reasons of public policy; nor can it be destroyed by compromise; and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety." 208 U.S. at 598.

In *Northern Pacific Railway*, the city of Duluth contracted with a railroad company to build an overpass – with financial contributions from the railroad company – and to maintain the overpass at the city's expense for fifteen years. Before this term expired, the city sought to require the railroad to pay for needed repairs.  The Court affirmed a state court decision requiring the railroad company to carry out and pay for repairs to the overpass running over its railroad.  The critical fact was that the railroad's original charter tacitly incorporated the power of the state (and thus a city) to require a railroad to accommodate public roads

crossing its tracks and inherently provided that any contract to the contrary would be deemed void. *Id.* at 595, 598.

*Trotter* involved a private contract between an attorney and a person who was not an attorney for referral fees. The Indiana Supreme Court held that the contract was against public policy and thus unenforceable. See 684 N.E.2d at 1151. Because the contract was a private one, the case offers little guidance on the scope of a local government's power to make a contractual promise like this one.

Contract provisions that appear to impose substantial limits on a government's police powers pose a difficult problem. There are powerful reasons and policy arguments on both sides. A government like the city of Carmel must retain its power to promote the public's health, safety, and welfare. A contract that purports to bind successor governments can undermine the ability of the electorate to vote for change. On the other hand, governments need to make contracts for a host of reasons. Businesses and others who do business with a government need to be able to count on being able to enforce their contracts. Governments derive great benefits from private contracts – recall the property and other benefits Carmel received under the Parkway Contract. Enforcing those contracts is vital to providing for and implementing public welfare. Without that ability, it would be more difficult or at least more expensive for local governments to meet their needs. This tension was addressed in some detail by Professor

Janice C. Griffith in a lengthy law review article, *Local Government Contracts: Escaping from the Governmental/Proprietary Maze*, 75 Iowa L. Rev. 277, 280-86 (1990) (also proposing a multi-factor test to evaluate whether local government contracts impair use of essential public powers).

In this case, it may be most useful to think of the public policy argument in terms of available remedies.  Carmel argues that if the Parkway Contract is interpreted according to the meaning the court believes is clear, then the contract should be deemed void as contrary to public policy.  That is a possible conclusion, and the court certainly does not mean to rule it out at this point.  But if the contract is deemed void, that will not necessarily mean that Carmel simply wins on the claim.  Instead, the appropriate remedy may include a rescission of the contract, including the benefits Carmel received under the Parkway Contract, such as the rights-of-way that Carmel used to build the Hazel Dell Parkway.  If rescission is not a practical option, equity may provide substitute remedies for true rescission, including payment of damages as compensation.

The United States Supreme Court addressed an analogous but much larger problem in *United States v. Winstar Corp.*, 518 U.S. 839 (1996).  In response to the savings and loan crisis of the 1980's, a federal agency agreed that healthy financial institutions that acquired failing institutions would be entitled to certain favorable accounting treatment.  Congress later enacted legislation eliminating the favorable accounting treatment, leading to financial losses.  *Id.* at 856-58.  The

Supreme Court ultimately affirmed a finding that the federal government was liable for damages resulting from the government's breach of the promises to allow the favorable accounting treatment.

Like Carmel in this case, the federal government had argued in *Winstar Corp.* that it could not barter away elements of its sovereign power.  The plurality opinion by Justice Souter offered a clear and simple rebuttal:  "a contract to adjust the risk of subsequent legislative change does not strip the Government of its legislative sovereignty."  518 U.S. at 889.  A concurring opinion by Justice Scalia, joined by Justices Kennedy and Thomas, explained that where "Congress specifically set out to abrogate the *essential bargain* of the contracts at issue," the courts had found and should continue to find impermissible repudiation of contractual promises.  *Id.* at 924.

Martin Marietta's claim for breach of contract could be viable under either approach from *Winstar Corp.*  The Parkway Contract may be viewed as a contract that burdens the city with the risk that further legislation or other activities of the city would injure American and its successors in interest.  Under that approach, the city's turnabout toward Martin Marietta's mining operations could support a claim for damages.  The city's position may also be viewed as an abrogation of the "essential bargain" of the Parkway Contract, so that the city could be held liable for repudiating its promises.  At this stage of this case, without a better developed factual record and briefs that address the problem in more detail, the court does

-21-

not intend to make a definitive prediction about just how Indiana courts would resolve this problem.  At this stage, however, the court is not persuaded that Indiana law applicable to local government contracts would allow Carmel both to keep the benefits under the Parkway Contract and to avoid any responsibility for any proven breach of its own promises under that same contract.

C.    *Estoppel Defense*

Carmel argues that even if it has breached the Parkway Contract, Martin Marietta's claims are barred by three types of estoppel.  The Indiana Supreme Court has explained:

> Estoppel is a judicial doctrine sounding in equity.  Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct.  *In re Edwards*, 694 N.E.2d 701, 715 (Ind. 1998).  There are a variety of estoppel doctrines including:  estoppel by record, estoppel by deed, collateral estoppel, equitable estoppel – also referred to as estoppel *in pais*, promissory estoppel, and judicial estoppel.  28 Am. Jur. 2d *Estoppel and Waiver* § 2 (2000).  All, however, are based on the same underlying principle:  one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other.  31 C.J.S. *Estoppel and Waiver* § 2 (1996).

*Brown v. Branch*, 758 N.E.2d 48, 51-52 (Ind. 2001).  Carmel's estoppel defense fails for lack of proof of both inconsistent conduct and detrimental reliance.

The city's first estoppel theory is that Martin Marietta "accepted benefits" of the BZA process by filing and gaining approval of the first and second special

use applications for sand and gravel mining on the Mueller properties.[6]  Carmel is not entitled to summary judgment on this theory.  First, Martin Marietta's claim of breach is much broader, applying to the enactment of the 2003 and 2005 mining ordinances and to the city's attempts to defend them in court.  See Compl. at 24 (prayer for relief on Count II).  Second, the court has determined that the breach of contract claim properly reaches only land in which American had ownership rights in 1997.  The claim does not reach the BZA's review of applications for mining the Mueller properties or the BZA's procedural rule change as applied to the denial of Martin Marietta's third applicaton to mine Mueller South for limestone.  The court need not reach the issue of the estoppel  defense as applied to city actions to limit or restrict mining on the Mueller properties.

_____

[6]In support of this specific theory of estoppel, Carmel quotes 28 Am. Jur. 2d *Estoppel and Waiver* § 65 (2000):  "Generally, equitable estoppel is applied to transactions where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he or she accepted a benefit.  Such estoppel . . . precludes one who accepts the benefits from repudiating the accompanying or resulting obligation."  See also *Williams v. Riverside Community Corrections Corp.*, 846 N.E.2d 738, 751 (Ind. App. 2006) ("a party may not accept benefits under an agreement or instrument and at the same time repudiate its obligations").  This general principle seems to refute Carmel's argument that it should be entitled to retain all the benefits it received under the Parkway Contract without being required to fulfill its own obligations under the same contract, though it is not clear whether the theory might apply to the city in this situation. See generally *Hannon v. Metropolitan Development Comm'n of Marion County*, 685 N.E.2d 1075, 1080 (Ind. App. 1997) (observing that equitable estoppel ordinarily is not applied to a local government unless its conduct threatens public interest).  Also, in the contract, Carmel warranted that performance of the contract "will not conflict with any applicable provision of any federal, state, or municipal law . . . ."  Def. Ex. 1 at ¶7(c).  See *Speckman v. City of Indianapolis*, 540 N.E.2d 1189, 1191 (Ind. 1989) (finding that the city was estopped from challenging the validity of a contract where the city's attorneys had reviewed the contract and found it to be "proper in all respects").

To clarify, the court does not understand Martin Marietta's position to be that the Parkway Contract exempted Martin Marietta from complying with BZA processes and requirements; its position is that the defendants have unfairly perverted and twisted those processes. That much is evident from the Complaint's request for relief on Count I, the constitutional claims, which seeks injunctive relief to prevent unfair interference with or departures from fair BZA procedures.

Carmel's second estoppel theory is that Martin Marietta's current position is inconsistent with its past conduct. Carmel contends that Martin Marietta did not previously assert in the many prior judicial and administrative proceedings concerning Martin Marietta's mining operations the position that the ordinances violated its rights under the Parkway Contract. Apart from the misdirected argument addressed just above, however, Carmel has not pointed to any contradiction between Martin Marietta's positions in this lawsuit and positions it has taken in other proceedings.

Carmel also asserts that Martin Marietta's position in this lawsuit is inconsistent with the terms of the 2002 Kingswood Settlement to which it was a party. The court does not see the inconsistency. In the Kingswood Settlement, Martin Marietta agreed that it would not conduct limestone mining on the Mueller property without seeking a change "in zoning classification or other zoning approval." Def. Ex. 5, ¶ B(2). Martin Marietta also acknowledged as part of the same agreement that nothing in the Kingswood Settlement "shall be deemed a

restraint upon the police power of the City." *Id.*, ¶E(8).  The court does not understand Martin Marietta to be arguing that it could not be required to seek a special use permit, but instead, to be asserting that it is entitled to a fair hearing without the city's and the mayor's active intervention and interference to skew the process.  Also, Martin Marietta is not arguing in this lawsuit that the Kingswood Settlement imposes restraints on the city's police power.  The company is arguing that the Parkway Contract did so.  That contract contains no similar reservation of police powers.  It includes instead a warranty from the city that performance of the agreement will not conflict with any "applicable provision of any federal, state, or municipal law. . . ."  Def. Ex. 1, ¶ 7(c).  In summary, Carmel has not shown that Martin Marietta has acted inconsistently and should be estopped from asserting its claim for breach of contract.

Carmel's third estoppel theory is that the city detrimentally relied on Martin Marietta's silence regarding Martin Marietta's breach of contract claim during years of state court litigation.  Carmel has not shown that it would have acted any differently if it had known earlier of Martin Marietta's contentions in this lawsuit.  That is, Carmel has not shown that it relied to its detriment on Martin Marietta's conduct or statements.  See *Weinig v. Weinig*, 674 N.E.2d 991, 997 (Ind. App. 1996) (noting that the party asserting estoppel has the burden of proving detrimental reliance).

II.   *Inverse Condemnation Claim*

Martin Marietta alleges in Count III that Carmel has inversely condemned Martin Marietta's interest in Mueller South by denying the third special use application. In that application, Martin Marietta sought approval to surface-mine limestone on Mueller South. Martin Marietta has appealed this denial in Count IV. The inverse condemnation claim is a state law claim presented via supplemental and diversity jurisdiction. The parties have not suggested that the standards for a taking under Indiana law differ from the federal standards. See *Town of Georgetown v. Sewell*, 786 N.E.2d 1132, 1139 (Ind. App. 2003) (analyzing state inverse condemnation claim using federal takings standards). The court is aware that supplemental jurisdiction for this state law claim may be fragile because the plaintiff has not exhausted its avenues for judicial review of the restrictions on its use of the property. Cf. *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194-97 (1985) (holding that property owner has not suffered violation of federal Just Compensation Clause until the owner has unsuccessfully tried to obtain just compensation through state law procedures). Nevertheless, at this stage of the case, the court finds no reason under 28 U.S.C. § 1367(c) to decline such jurisdiction.

Defendants' brief in support of summary judgment argued that a prohibition on surface-mining of limestone did not amount to a taking of private property. The brief did not raise any issue as to the timing of the claim, though the challenge to the 2005 mining ordinance remains pending in the state courts and

the issue of the BZA's denial of the special use permit is before this court.  Martin
Marietta's response also did not raise any issue as to a possible temporary taking.
At this stage, the parties have framed the takings issue in terms of whether a
permanent prohibition on surface mining of limestone would amount to a taking
of Martin Marietta's leasehold interest in the Mueller property.

To decide whether a government regulation of land use amounts to a taking
of property under the Fifth or Fourteenth Amendments to the United States
Constitution, the court must determine whether the government action deprived
the owner of all economic use of the land.  See *Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528, 538 (2005).  If so, the action is a *per se* taking.  *Id.*  If not, the court
analyzes the factors addressed in *Penn Central Transportation Co. v. City of New
York*, 438 U.S. 104 (1978), to determine whether the action may still constitute a
taking.  Under *Penn Central*, the court considers the action's economic impact on
the property owner – particularly any interference with distinct, investment-
backed expectations – and the character of the government action.  *Id.* at 124.

In evaluating whether the deprivation is complete or merely partial, a bright
dividing line is not always available.  See *Lucas v. South Carolina Coastal Council*,
505 U.S. 1003, 1016 n.7 (1992).  In *Lucas,* the petitioner bought land on the
South Carolina coast on which he planned to build houses.  *Id.* at 1006-07.  Two
years later, South Carolina enacted legislation that prohibited the petitioner from
building homes on the property.  *Id.* at 1007.  The regulation did not prevent all

potential uses of the land but it required the owner to leave the land substantially in its natural state. *Id.* at 1009 n.2, 1018. The Court determined that such a result could constitute a denial of all economic benefits and would amount to a regulatory taking.

The fact that the government enacted the regulation *after* the petitioner had purchased the property was central to the *Lucas* Court's analysis. *Id.* at 1027-32. The Court stated that "regulations that prohibit all economically beneficial use of land . . . cannot be newly legislated or decree (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at 1029. See also *Lingle*, 544 U.S. at 538 (recognizing that the finding of a total regulatory taking in *Lucas* rested on enactment of a regulation after the property involved was acquired that exceeded common law restrictions).

Regulations – even those that appear to effect substantial and possibly total takings – enacted *before* the property interests vested are analyzed, however, under the *Penn Central* factors. In *Palazzolo v. Rhode Island*, 533 U.S. 606, 614-15 (2001), Rhode Island enacted legislation and regulations severely restricting future development on coastline property. After these enactments, the petitioner acquired land subject to the restrictions and applied for a development permit. *Id.* The agency responsible for approving coastline development proposals found that the petitioner needed to qualify, and did not, for a special exception to the

applicable regulatory standards. *Id.* at 615. In analyzing the petitioner's takings claim, the *Palazzolo* Court concluded that legislation restricting the owner's use of the land could still impose a taking of after-acquired property if the restriction is unreasonable. *Id.* at 626-27. In such cases, the courts should evaluate the reasonableness of the regulation's effect on land use with the help of the *Penn Central* factors. *Id.* at 630.

In this case, some legislation was in place before Martin Marietta's interest in Mueller South vested under the lease of January 1, 2000, and at least some of the legislation was enacted after vesting. Under Carmel's zoning ordinance, at least as of 2002, non-conforming land uses in residential areas required special use permits unless the uses qualified as legal non-conforming uses. R. 9042-47, 9169-70, 9244.[7] A legal non-conforming use may continue after coming under Carmel's zoning jurisdiction if the use is continuous. R. 9169-70. Such classification is limited to the portion of land being used in a legal, non-conforming manner. *Id.* It also appears that there is some flexibility in allowing legal non-conforming uses to evolve into other legal non-conforming uses with the same restrictions without seeking further approval. *Id.* at 9169.

---

[7]There is another exception for existing uses eligible for special permits. Such uses do not require special approval unless the owner alters, enlarges, or extends the existing use. R. 9169-70. The difference between the two exceptions seems to be that, unlike existing uses eligible for special permits, identified legal non-conforming uses may be able to evolve into other legal non-conforming uses without requiring a special use permit. No evidence indicates that surface mining had ever occurred on Mueller South, so the existing use exception does not seem to apply.

Martin Marietta signed the Mueller lease on January 1, 2000. At that time, Carmel had not yet zoned Mueller South. It is unclear if Carmel's zoning ordinance required a special use permit to mine in residential districts in 2000. See note 2 above. The legal non-conforming use provision in 2001 is, however, substantially similar to the provision existing in 1957. R. 8701-02, 8708, 9169-70. As of January 1, 2000, if Martin Marietta had begun mining Mueller South before Carmel zoned the land, regulations existed that would have allowed mining to be classified as a legal, non-conforming use – and hence relatively free from land use regulation by the city. Based on the zoning ordinances submitted at this point, the court is uncertain, however, whether Martin Marietta's desire to mine the property would have been subject in January 2000 to discretionary special use approval or denial. If not, meaning that Martin Marietta was entitled to use the land for mining as a matter of right, then Martin Marietta's takings claim should be analyzed under the *Lucas* standard: whether or not the BZA denied Martin Marietta all economic use of Mueller South.

Like the property owner in *Lucas*, Martin Marietta took an interest in the Mueller land with a very specific purpose: here, to mine limestone. The BZA approved Martin Marietta's application to mine sand and gravel on Mueller South, but denied the third application to surface-mine limestone. Martin Marietta presented evidence that the costs of mining sand and gravel have already exceeded $5,000,000, in addition to $2,000,000 made in rental payments. Pl. Ex.

6 at 3.  Over the course of the next ten years, Martin Marietta will make rental payments of at least $3,000,000 more.  See *id*; Def. Ex. 3 at 2-3.

Martin Marietta presented evidence that these rental payments and other costs dramatically exceed any income that can be gained from mining limited to sand and gravel, so that mining limestone is essential for Martin Marietta to use Mueller South in any economically viable way.  Pl. Ex. 6 at 3.  Martin Marietta has been allowed to mine sand and gravel from Mueller South, and therefore was not required to leave the land substantially in its natural state.  In light of the rent and royalties that Martin Marietta agreed to pay for the right to mine for limestone, the sand and gravel operation would have been unprofitable if it had been the only mining allowed on the property.  Martin Marietta engaged in the unprofitable sand and gravel operation only to prepare the property for surface mining of limestone.  Without its reasonable expectation that Mueller South could later be mined for limestone, Martin Marietta would not have begun the costly process of extracting sand and gravel from Mueller South and would not have entered into the Mueller lease.

Defendants pointed out at oral argument that Mueller South could be used for other non-mining purposes, suggesting a golf course.  This line of reasoning is similar to the one offered in *Lucas* where the plaintiff bought the land for residential development.  The government then enacted a regulation prohibiting residential construction on the plaintiff's property but still permitted the building

of boardwalks and decks.  505 U.S. at 1008, 1009 n.2.  The *Lucas* Court refused to engage in calculating percentages of diminished value to resolve this situation, steering the relevant inquiry instead to the owner's reasonable expectations based on the legally acceptable uses of the land before the regulation was enacted.  *Id.* at 1016 n.7.

Here, Martin Marietta had a commercial lease to mine Mueller South.  It could use the land in a variety of ways, presumably including – at least in theory – as a golf course.  But at the time the land was leased and Martin Marietta committed to paying millions of dollars in rent, Martin Marietta reasonably could have expected that mining Mueller South would qualify as a legal non-conforming use allowed as a matter of right.[8]  The later enactment of zoning regulations requiring Martin Marietta to apply for discretionary permits to mine Mueller South and the subsequent denial of the mining application could constitute a regulatory taking of Martin Marietta's property rights as a lessee.  The fact that Martin

---

[8]Indiana law does not give local governments unfettered discretion in deciding whether a legal non-conforming use is permissible.  See *Town of Merrillville Board of Zoning Appeals v. Public Storage, Inc.*, 568 N.E.2d 1092, 1094-95 (Ind. App. 1991) (observing that granting variances is a matter committed to the discretion of boards of zoning appeals, while granting special exceptions is mandatory once the petitioner shows compliance with statutory criteria; "[o]nce a petitioner has established its right to a special exception by presenting sufficient evidence of compliance with relevant statutory requirements, the exception must be granted."), citing *Porter County Board of Zoning Appeals v. Bolde*, 530 N.E.2d 1212, 1214 (Ind. App. 1988) (defining a special exception as a use permitted once certain statutory criteria have been satisfied), and *Boffo v. Boone County Board of Zoning Appeals*, 421 N.E.2d 1119, 1123 (Ind. App. 1981) (same).

Marietta could still use the land to construct a golf course does not defeat the claim for inverse condemnation.  The government has the authority to effect such a regulatory taking, but it also has the obligation to pay for the taking if it does.

While it is true that Martin Marietta has not been denied *all* income-generating use of Mueller South, Martin Marietta offered evidence that the BZA has denied all *profitable* use of Mueller South.  The court should not be understood as saying that all property owners or leaseholders are entitled either to make the most profitable use of property or to be paid compensation for the loss of such use.  In this case, however, Martin Marietta has come forward with evidence that it committed millions of dollars to the mining of the Mueller South property at a time when it reasonably could have expected to be able to use the property for that purpose.  The city later enacted provisions of law that have been applied thus far to prohibit that use.  On this record, and as the issues have been framed, Martin Marietta has presented sufficient evidence to allow a reasonable trier of fact to conclude that the defendants have denied Martin Marietta all economically beneficial use of Mueller South.  Defendants' motion for summary judgment is therefore denied as to the inverse condemnation claim.

*Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is DENIED as to the inverse condemnation claim.  Summary judgment for the

breach of contract claim is GRANTED in favor of Carmel regarding actions affecting mining on the Mueller property but DENIED regarding actions affecting mining on land Martin Marietta's predecessor owned on November 5, 1997.

So ordered.

Date: November 28, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana


Copies to:

Bryan Harold Babb
BOSE MCKINNEY & EVANS, LLP
bbabb@boselaw.com

Abigail B. Cella
ICE MILLER LLP
abby.cella@icemiller.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Thomas Eugene Mixdorf
ICE MILLER LLP
thomas.mixdorf@icemiller.com

John Raymond Molitor
jmolitor@prodigy.net

H. Wayne Phears
PHEARS & MOLDOVAN
wphears@pmlawfirm.com

Seth M. Thomas
ICE MILLER LLP
seth.thomas@icemiller.com

Alan S. Townsend
BOSE MCKINNEY & EVANS LLP
atownsend@boselaw.com

Zeff A. Weiss
ICE MILLER LLP
weiss@icemiller.com